OPINION OF THE SUPREME COURT OF NEBRASKA

NOTICE: DUE TO UNFORESEEN CIRCUMSTANCES, THIS OPINION IS BEING POSTED
TEMPORARILY IN "SLIP" OPINION FORM. IT WILL BE REPLACED AT A LATER
DATE WITH AN "ADVANCE" OPINION, WHICH WILL INCLUDE A CITATION.

Case Title

STATE OF NEBRASKA, APPELLEE,
V.
LARON M. JONES, APPELLANT.

Case Caption

STATE V. JONES

Filed April 28, 2016.    No. S-15-370.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY,
Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Jessica C. West for
appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

STATE v. JONES

Filed April 28, 2016.   No. S-15-370.

1. **Jury Instructions: Judgments: Appeal and Error.** Whether the jury instructions given by a trial court are correct is a question of law. When reviewing questions of law, an appellate court resolves the questions independently of the conclusion reached by the lower court.

2. **Criminal Law: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

3. ____: ____: ____. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Sentences: Words and Phrases: Appeal and Error.** An appellate court reviews criminal sentences for an abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5. **Criminal Law: Pretrial Procedure: Motions to Suppress: Appeal and Error.** In a criminal trial, after a pretrial hearing and order overruling a defendant's motion to suppress, the defendant, to preserve the issue on appeal, must object at trial to the admission of the evidence which was the subject of the suppression motion.

6. **Appeal and Error.** Asserting or arguing plain error does not relieve a defendant of properly preserving errors for appellate review.

7. ____. Plain error exists where there is error, plainly evident from the record but not complained of at trial, that prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

8. ____. Where an issue is raised and complained of at trial, it cannot be the basis of a finding of plain error on appeal.

9. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

10. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, an appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

11. **Sentences.** In imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the offense.

HEAVICAN, C.J., WRIGHT, CONNOLLY, MILLER-LERMAN, CASSEL, and STACY, JJ., and MOORE, Chief Judge.

WRIGHT, J.

## I. NATURE OF CASE

Following a jury trial, Laron M. Jones was convicted of first degree murder, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person for the shooting death of Brandon Samuels. He was sentenced to life imprisonment for murder, and consecutive terms of 10 to 20 years' imprisonment on each of the other two convictions. Finding no merit to the errors assigned on appeal, we affirm Jones' convictions and sentences.

## II. BACKGROUND

### 1. EVENTS SURROUNDING SHOOTING

In the early morning hours of March 7, 2014, a group of friends gathered at the home of Alanna Delaney for an "after-hours" party. Those in attendance included Delaney; Saraha Richards; Jamie Thiem; Dale Gaver; Josue Sanchez; Giovanni Barrios; D'Angelo Goods; and the decedent, Samuels, among others. Around 2:30 a.m., three black males and one black female arrived uninvited at the party. One of the black males was Milton Butler, who came to the party to confront Thiem, his ex-girlfriend and the mother of his child. One of the black males was identified as Jones. The other black male and black female were never identified.

Butler barged into the residence and began yelling at Thiem. Then he pulled her out of the house by her hair, banging her head against a doorframe on the way out. Others at the party were concerned and followed them outside. Sanchez came to Thiem's aid, and a fight ensued in the front yard with Butler, Jones, and the unidentified black male teaming up against Sanchez. Jones brandished a gun and stated that anyone who jumped in to help Sanchez would be shot. The fight dissipated after Sanchez was knocked unconscious and taken back into the house by his friends.

Butler, Jones, and the unidentified black male and black female got into their vehicles and began leaving the scene. Most of the people from the party went back inside the house. As Butler was backing his vehicle out of the driveway, Goods came outside to retrieve something from the front yard. Butler then stopped his vehicle, got out, and began a second altercation with Goods. Just as the altercation was about to turn physical, several shots were fired into the air, followed by a pause, and then several more shots were fired toward the house. Samuels was standing on the porch and suffered gunshot wounds in his lower right leg and in the right side of his neck. He died from those injuries.

### 2. WITNESS TESTIMONY

#### (a) Alanna Delaney

Delaney testified that during the initial altercation with Sanchez, an individual she knew as "Clown" flashed a gun from his waistband and told her not to interfere with the fight or she would be shot. She was standing in the middle of the yard when shots rang out. Gaver pushed her

to the ground and told her to stay down. While lying on the ground, she lifted her head and clearly observed "Clown" shooting the gun toward the porch.

Delaney testified that she was familiar with both "Clown" and Butler and that there was no doubt in her mind it was "Clown" shooting the gun, not Butler. Delaney knew Butler due to Butler's relationship with Thiem, and she had met him approximately 5 to 10 times. She was familiar with "Clown" from having met him at a location she described as a haunted house and a couple of times at her house or a bar when he was with Butler. Delaney described Butler as "skinnier" and having a "fade or a brush cut" hairstyle. By contrast, Delaney stated that "Clown" was "thicker," and she described his hairstyle as "French braided to the scalp." She stated that "Clown" was wearing a black T-shirt and blue jeans. Delaney identified Jones in court as "Clown."

### (b) Saraha Richards

Richards knew Butler through Thiem and described him as being skinny and having short hair. She had also met "Clown" on a couple of prior occasions, including a New Year's Eve party approximately 3 months prior to this incident. She described "Clown" as similar in height to Butler, but "heavier." Richards stated that before the shooting occurred, "Clown" said that if anyone interfered with the fight that was going on, that person was going to get shot. She said that "Clown" fired the first few shots in the air, then lowered the gun and started shooting at the house. Richards identified Jones in court as "Clown."

### (c) Dale Gaver

Gaver testified that he saw "Clown" display the gun prior to the shooting and then observed him fire the gun three times into the air. Gaver started running toward the side of the house and heard more shots fired. As he got to the corner of the house, he turned around and saw "Clown" aiming and shooting the gun at the house. He explained that although it was dark outside, he could see what was going on because a street light was on, and that he was only about 10 feet away when he observed "Clown" flash the gun. Gaver described "Clown" as wearing a hoodie and a darker shirt. Gaver stated that "Clown" was wearing a hat initially, but was no longer wearing the hat once he became involved in the altercation with Sanchez. Gaver identified Jones in court as "Clown."

### (d) D'Angelo Goods

Goods described the shooter as shorter and stockier with "nappy" braided hair that looked as if it had not been freshly done. Goods testified that during his altercation with Butler, the shorter, stockier individual approached the yard and asked, "'What's up?'" Goods observed the man firing shots into the air, then aiming and shooting at the house. He did not see Butler or anyone else with a gun, other than the stockier black male with nappy hair.

### (e) Giovanni Barrios

Barrios testified that he attempted to stop the fight, but that one of the black men flashed a gun and told him to back up. Barrios described this man as having a "[b]igger build, stockier, facial hair" and wearing jeans and a hoodie. Barrios identified Jones in court as that man.

## 3. INVESTIGATION

The witnesses were separated at the scene and individually transported to police headquarters to be interviewed. Jones was developed as a suspect as a result of those interviews. Delaney, Richards, and Gaver each identified Jones in a photographic lineup as the shooter. Barrios identified Jones as the man that brandished a gun during the initial altercation.

The following day, officers executed a search warrant at a residence Jones shared with his girlfriend, Jenna McBride. She confirmed that Jones' nickname is "Clown." She described Jones as "a little bit shorter, stockier with longer hair" that is "braided back." McBride directed officers to the clothes Jones had been wearing the night before, which included a pair of dark jeans, a black T-shirt, and a light gray zip-up hoodie with a broken zipper.

McBride was taken in and interviewed by law enforcement. She testified that she received a text message from Jones at 3:04 a.m. on March 7, 2014, asking her to pick him up at his aunt's house as soon as possible. When she picked him up approximately 15 minutes later, he was with Butler and another older black male who went by the name of "Mario." McBride described Jones' demeanor as "mad and irritated." Jones told McBride about the fight and mentioned that someone had been shot.

Jones was arrested and charged with first degree murder, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person.

## 4. MOTION TO SUPPRESS

Prior to trial, Jones moved to suppress witness identification testimony, alleging that the identification procedure used by police was unnecessarily suggestive and tainted the identifications. The evidence adduced at the hearing showed that a lineup consisting of six photographs was used, which accidentally included two photographs of Jones: one in position No. 5, and one in position No. 6. The detective who created this lineup attributed the error to sloppiness on his part.

This lineup was shown to at least two witnesses, including Delaney, who identified Jones in position No. 5. The other witness did not identify anyone in the lineup and did not identify Jones at trial. It is unknown whether any other witnesses were shown this flawed lineup.

At the suppression hearing, the State offered the following testimony: The police separated the witnesses at the scene and transported them to the police station in separate cruisers, the witnesses were kept in separate areas at the station, and officers were standing by to make sure they did not converse with one another.

Delaney testified that the fact that "Clown" was depicted twice in the photographic lineup did not affect her identification of him. In fact, she did not even notice "Clown's" photograph in position No. 6 until she was reviewing the lineup later in the county attorney's office. The detective that administered the lineup was also unaware of the mistake until she returned to her desk after showing it to Delaney. At that point, a new photographic lineup was created in which the photograph in position No. 6 was replaced with a different photograph; however, the other photograph of Jones remained in position No. 5.

Richards, Gaver, and Barrios were shown the corrected lineup. Richards and Gaver identified the shooter in position No. 5. Richards wrote on the comments section that she was

"110,000%" sure he was the shooter. Barrios identified the person who flashed the gun in position No. 5.

The witnesses' cell phones were confiscated, and they were told not to communicate with other witnesses until all of them had been interviewed. All of the witnesses were admonished not to speak to other witnesses about their identifications. Delaney, Richards, Gaver, and Barrios testified that they did not talk to any other witnesses prior to being interviewed and did not discuss their identifications with any other witnesses.

The district court issued a written order denying Jones' motion to suppress. The court found that Delaney was the only witness who saw the photographic lineup that had two pictures of Jones. The other witnesses were shown photographic lineups that contained only one photograph of Jones.

## 5. TRIAL

The evidence at trial was consistent with the facts stated above. In addition, there was evidence regarding DNA testing that was performed on a "Brooklyn Nets" ball cap found at the scene. Although it produced only a partial DNA profile, Jones could not be excluded as the major contributor. The probability of a random individual matching that DNA profile is 1 in 7 billion for Caucasians, 1 in 4.28 billion for African-Americans, and 1 in 16.6 billion for American Hispanics. The parties also stipulated that Jones had been convicted of a felony and was a person prohibited from possessing a deadly weapon.

After all the evidence had been presented, a jury instruction conference was held. Jones offered the following proposed instruction: "Research has shown that people may have greater difficulty in accurately identifying the members of a different race. You should consider whether the fact that the witness and the suspect are not of the same race may have influenced the accuracy of the witnesses' identification." The State objected, and the district court refused to give the proposed instruction.

The jury found Jones guilty of first degree murder, use of a deadly weapon (firearm) to commit a felony, and possession of a deadly weapon by a prohibited person. He was sentenced to life imprisonment for murder, and consecutive terms of 10 to 20 years' imprisonment on each of the other two convictions. Jones appeals.

## III. ASSIGNMENTS OF ERROR

Jones assigns that the district court (1) committed plain error in denying his motion to suppress witness identification testimony, (2) erred in refusing his proposed jury instruction regarding cross-racial identification, (3) abused its discretion by accepting the jury's guilty verdicts when the evidence was insufficient to sustain his convictions, and (4) imposed excessive sentences on the weapon convictions.

## IV. STANDARD OF REVIEW

[1] Whether the jury instructions given by a trial court are correct is a question of law.[1] When reviewing questions of law, an appellate court resolves the questions independently of the conclusion reached by the lower court.[2]

[2,3] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[3] The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[4]

[4] An appellate court reviews criminal sentences for an abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[5]

## V. ANALYSIS

### 1. MOTION TO SUPPRESS IDENTIFICATION

Jones argues that the district court committed plain error in overruling his pretrial motion to suppress witness identification testimony, because the identification procedure used by police was unnecessarily suggestive and tainted the identifications. The evidence showed that a lineup consisting of six photographs was shown to at least two witnesses, which included two photographs of Jones: one in position No. 5, and one in position No. 6.

Jones argues that officers made little effort to remedy the error once it was discovered. They created a new photographic lineup, but left Jones' photograph in position No. 5, which was the same position used when Delaney identified Jones in the earlier flawed lineup. Once the new lineup was created, Richards, Gaver, and Barrios also identified Jones in position No. 5. Jones claims the placement of his photograph in position No. 5 was significant, because Delaney could have easily disseminated information about her identification to other witnesses who were being detained at the police station in hallways, cubicles, and unlocked interview rooms. There was no evidence that Delaney talked to other witnesses.

Jones further argues that the identification testimony was unreliable, because the witnesses' degree of attention and certainty was low, they were under the influence of alcohol and/or narcotics on the night in question, and they are all of a different race than Jones, which results in less reliable identification than if both persons are of the same race.

---

[1] *State v. Casterline, ante* p. 41, ___ N.W.2d ___ (2016).

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *State v. Collins*, 292 Neb. 602, 873 N.W.2d 657 (2016).

[5] We agree with the State that Jones has waived any error with respect to the district court's denial of his motion to suppress witness identification testimony because he failed to object at trial when the State's witnesses identified him in court as the shooter. In a criminal trial, after a pretrial hearing and order overruling a defendant's motion to suppress, the defendant, to preserve the issue on appeal, must object at trial to the admission of the evidence which was the subject of the suppression motion.[6] Because Jones failed to object to the identification testimony at trial, he failed to preserve this issue for appeal.

[6,7] We decline Jones' invitation to address this issue under the plain error doctrine. Asserting or arguing plain error does not relieve a defendant of properly preserving errors for appellate review.[7] Plain error exists where there is error, plainly evident from the record but not complained of at trial, that prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[8]

[8] Where an issue is raised and complained of at trial, it cannot be the basis of a finding of plain error on appeal.[9] Here, the issue was raised via Jones' motion to suppress and a full suppression hearing was held in the district court. Thus, we decline Jones' request that we consider the failure to object under a plain error analysis.

## 2. JURY INSTRUCTION

Jones asserts the district court erred in refusing his proposed jury instruction regarding cross-racial identification, which states as follows: "Research has shown that people may have greater difficulty in accurately identifying the members of a different race. You should consider whether the fact that the witness and the suspect are not of the same race may have influenced the accuracy of the witnesses' identification."

[9] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[10]

Jones cannot show that the tendered instruction is a correct statement of the law. There is no precedent in Nebraska for giving such an instruction, and Jones presented no evidence to support the theory asserted in his instruction. Given this lack of record, the district court had no basis upon which it could determine that the tendered instruction was a correct statement of the law.

In addition, Jones cannot show that the tendered instruction was warranted by the evidence, because while there may be an inference, the record does not reflect the race of the

---

[6] *State v. Walker*, 272 Neb. 725, 724 N.W.2d 552 (2006).

[7] *State v. Williams*, 247 Neb. 878, 530 N.W.2d 904 (1995).

[8] *State v. Kays*, 289 Neb. 260, 854 N.W.2d 783 (2014).

[9] *Wilson v. Wilson*, 23 Neb. App. 63, 867 N.W.2d 651 (2015), citing *In re Estate of Morse*, 248 Neb. 896, 540 N.W.2d 131 (1995).

[10] *State v. Casterline, supra* note 1.

witnesses. Therefore, we cannot determine whether there were in fact any cross-racial identifications that might warrant the giving of such an instruction. The district court did not err in refusing to give Jones' proposed instruction.

### 3. SUFFICIENCY OF EVIDENCE

Jones next assigns that the district court erred in accepting the jury's guilty verdicts because the entire case was based upon unreliable and inconsistent eyewitness identification. He argues that the eyewitness testimony was not sufficient to support a finding of guilt beyond a reasonable doubt, because the identification testimony was tainted by the flawed lineup; the witnesses were vague and inconsistent in their descriptions of the suspect; and only two of the witnesses had previously met Jones, and their contact with him was limited.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[11] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[12]

In order to convict Jones of first degree murder, the State had to prove that Jones killed Samuels purposely and with deliberate and premeditated malice.[13] Jones was also charged with use of a deadly weapon (firearm) to commit a felony and possession of a deadly weapon by a prohibited person. To find him guilty of those offenses, the State had to prove that Jones knowingly and intentionally used a firearm to murder Samuels and that he had previously been convicted of a felony.[14]

Jones' arguments on appeal are limited to the sufficiency of the evidence to prove his identity, and he does not specifically challenge the sufficiency of the evidence as to the remaining elements of these offenses. We find that a rational trier of fact could conclude that those elements were satisfied.

Regarding Jones' identity, he was identified as the shooter by three separate eyewitnesses: Delaney, Richards, and Gaver. Each of those witnesses testified that Jones brandished a gun and threatened to shoot anyone that interfered in the fight. They each observed Jones fire the first few shots in the air, then lower the gun and fire shots at the house, striking and killing Samuels. Both Delaney and Richards had met "Clown" on multiple prior occasions and were familiar with his physical appearance. This evidence, viewed in the light most favorable to the prosecution, was sufficient to establish beyond a reasonable doubt Jones' identity as the shooter.

---

[11] *Id.*

[12] *Id.*

[13] See Neb. Rev. Stat. § 28-303(1) (Reissue 2008).

[14] See Neb. Rev. Stat. §§ 28-1205 and 28-1206 (Cum. Supp. 2014).

### 4. EXCESSIVE SENTENCES

Jones' final assignment of error is that the district court abused its discretion by imposing excessive sentences.

Jones was convicted of first degree murder, which carries a mandatory life sentence.[15] Use of a firearm to commit a felony is a Class IC felony, punishable by 5 to 50 years' imprisonment.[16] Possession of a firearm by a prohibited person is a Class ID felony for a first offense, punishable by 3 to 50 years' imprisonment.[17] Jones was sentenced to consecutive terms of 10 to 20 years' imprisonment for each of the weapon offenses. As such, his sentences are well within the statutory limits.

[10] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, an appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[18] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[19]

[11] In imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the offense.[20] There is no evidence that the district court failed to consider the appropriate factors in determining Jones' sentences on the weapon offenses.

Jones argues that if the district court had properly suppressed the identification testimony and found that there was insufficient evidence to convict him of murder, then at worst, he would have been convicted of possession of a firearm by a prohibited person and would have been facing a much lesser sentence. We find no merit in this argument, given that we have rejected his assignments of error regarding the identification testimony and the sufficiency of the evidence. We find no abuse of discretion in the sentences imposed.

## VI. CONCLUSION

For the reasons set forth above, we affirm Jones' convictions and sentences.

AFFIRMED.

---

[15] See § 28-303(1) and Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2014).

[16] See §§ 28-1205(1)(c) and 28-105(1).

[17] See §§ 28-1206(3)(b) and 28-105(1).

[18] *State v. Collins, supra* note 5.

[19] *Id.*

[20] *Id.*